# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UPPERLINE HEALTHCARE, PC, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00678** |
| | ) | **Judge Aleta A. Trauger** |
| JACLYN "CARLI" HOOVER, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are the Motion for Partial Summary Judgment as to Defendant Jaclyn "Carli" Hoover's Liability (Doc. No. 37) filed by plaintiff Upperline Healthcare, PC ("Upperline") and defendant Hoover's Motion for Summary Judgment (Doc. No. 40) on all of Upperline's claims against her.[1] For the reasons set forth herein, both motions will be denied.

## I. LEGAL STANDARD – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

---

[1] By separate Memorandum and Order filed simultaneously with this Memorandum, the court will deny Upperline's untimely Motion for Leave to File First Amended Complaint. (Doc. No. 35.)

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's

motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

At the same time, however, a defendant seeking summary judgment only needs to show that the plaintiff lacks sufficient evidence to prove a single element of a particular claim in order for the defendant to be entitled to summary judgment on that claim. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) ("As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim."). Conversely, when a plaintiff moves for summary judgment on its own claims, for which it carries the burden of proof and persuasion at trial, it faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). It must show the absence of a material factual dispute on all of the essential elements of its claim. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) ("In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's 'initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting *Cockrel*, 270 F.3d at 105)). Summary judgment in favor of the party with the burden of proof "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## II. PROCEDURAL HISTORY

Plaintiff Upperline initiated this action in the Chancery Court for Davidson County, Tennessee in May 2024, asserting claims against Hoover for breach of certain restrictive covenants set forth in an employment agreement between Hoover and Upperline. Hoover removed the case to this court on the basis of diversity jurisdiction.

Upperline alleges that Hoover voluntarily resigned on January 1, 2024, with her termination becoming effective on March 1, 2024 (after Upperline exercised its option to accelerate the effective date) and that, after she resigned, she immediately breached the restrictive covenants. The original Complaint sets forth breach of contract claims based on Hoover's allegedly violating the restrictive covenants by (1) creating a new, multi-office podiatric practice providing podiatric services at a clinic located 13.55 miles from the Upperline clinic in Orlando, Florida where Hoover practiced when she was employed by Upperline; (2) recruiting or soliciting Upperline's patients; and (3) recruiting and hiring former Upperline employees (Robert Hoover and Shamaria Resto).

Having been granted leave to do so, Upperline has filed a Motion for Partial Summary Judgment, seeking judgment in its favor on its claims against Hoover while leaving the computation of damages for trial. Hoover filed her own Motion for Summary Judgment. Each of these motions has been fully briefed, with a supporting Memorandum of Law (Doc. Nos. 39, 41), Statement of Undisputed Facts ("SUF") (Doc. Nos. 39, 42), the evidentiary material on which each party relies; and Response Memoranda (Doc. Nos. 47, 49), Responses to the Statements of Undisputed Facts (Doc. Nos. 48, 50), and Reply briefs (Doc. Nos. 52, 53).

Under the applicable standard, the court considers each motion separately.

### III.    UPPERLINE'S MOTION FOR PARTIAL SUMMARY JUDGMENT[2]

#### A.    Facts

Hoover's employment with Upperline as a podiatrist began in August 2022, shortly after she completed her residency and obtained her Florida medical license. (Doc. No. 40-1, 1st Hoover

---

[2] Unless otherwise indicated, the facts set forth in this section are undisputed for purposes of Upperline's Motion for Partial Summary Judgment and are viewed in the light most favorable to Hoover, as the non-moving party.

Decl. ¶¶ 4–5.) Hoover worked at Upperline's clinic located at 2014 South Orange Avenue in Orlando, Florida. (Doc. No. 50, Hoover's Resp. to Upperline's SUF ("HRSUF") ¶ 3; Doc. No. 37-2, Hoover Dep. 45.) Her responsibilities included providing podiatric services at the clinic and affiliated surgery centers, coordinating care for hundreds of patients, supervising other employees and mid-level providers, and treating patients as needed and arranged by Upperline. (HRSUF ¶ 3.) Hoover was compensated with an annual salary, along with eligibility for bonuses and benefits. (*Id.* ¶ 5.) Hoover's father, Robert Hoover,[3] was also employed by Upperline and practiced primarily at one of Upperline's Altamonte Springs, Florida locations. (HRSUF ¶ 2.)

The terms of Hoover's employment with Upperline were memorialized in an Employment Agreement ("Agreement") executed "following Hoover's and Upperline's back-and-forth negotiations concerning the Agreement." (*Id.* ¶ 1.) The Agreement provides that it is to be governed by, and construed in accordance with, Tennessee law and that any disputes arising out of or relating to an alleged breach of the Agreement must be resolved in a federal or state court located in Davidson County, Tennessee, with each party waiving any objection she or it might otherwise have to venue or jurisdiction. (Doc. No. 37-1, Agreement ¶ 13(f).)

The Agreement provides that both Upperline and Hoover could terminate it at will by giving either ninety days' (Hoover) or thirty days' (Upperline) advance notice. (*Id.* ¶¶ 6(b), (d).) The Agreement also contains restrictive covenants ("Restrictive Covenants") that apply "[d]uring the Term and for a period of two (2) years after termination of this Agreement, by any means and regardless of the reason therefor." (*Id.* ¶ 12(a).) The Restrictive Covenants, as relevant here, state that Hoover, as "the Podiatrist,"

---

[3] Defendant Carli Hoover is referred to herein as "Hoover." To avoid confusion, her father is referred to by his full name, "Robert Hoover."

shall not, either directly or indirectly, by or for . . . herself or by, for or in conjunction with any other person, company, enterprise or entity (whether as shareholder, member, owner, partner, joint venturer, employee, director, officer, agent, contractor, consultant, advisor, financing source or in any other capacity) do any of the following (nor assist any other person in doing or planning to do any such action):

(i) Compete with Employer;

(ii) . . . [H]ire, employ or engage any person who is or, at any time during the immediately preceding twenty-four (24) month period, was an employee or independent contractor of Employee . . . ;

(iii) Solicit . . . or endeavor to entice away any person who is or, at any time during the immediately preceding twenty-four (24) month period, was a patient of Employer . . . ;

. . . [nor]

(v) Disparage, discredit, demean or belittle Employer . . . .

(*Id.* ¶ 12(a).)

The term "compete" is defined for purposes of this provision as "engage or participate or be involved in any capacity in . . . the practice of podiatric medicine . . . anywhere within a fifteen (15) mile radius from the location at which Podiatrist provides services on behalf of Employer more than thirty (30) days during the six (6) month period preceding any date in question." (*Id.*)

In signing the Agreement, Hoover acknowledged that these provisions were "reasonable in scope and duration" and "reasonably necessary to protect the goodwill, trade secrets, Confidential Information and other legitimate business interests" of Upperline." (*Id.* ¶ 12(c).) In addition, the parties agreed that, if any court of competent jurisdiction "refuse[d] to enforce all or part of the covenants contained in this Section 12 because of excessive time or geographical limitations, policy considerations, statutory provisions, or for any other reason, . . . any such time or geographical limitations should be deemed reduced to the extent necessary to permit enforcement of such restrictions by the court." (*Id.*)

Hoover voluntarily resigned her employment, giving Upperline ninety days' notice on January 1, 2024. Her resignation became effective on March 1, 2024, when Upperline accelerated the ninety-day notice period in accordance with ¶ 6(b) of the Agreement. (HRSUF ¶ 8.) Hoover made the decision to leave Upperline to pursue private practice in December 2023. (Hoover Dep. 49.) She decided to partner with her former classmate, Dr. Sean Griffin. (Hoover Dep. 57.) The Articles of Organization for their new company, the Central Florida Foot and Ankle Institute, LLC ("CFFAI"), were filed with the Florida Secretary of State on January 16, 2024. (HRSUF ¶ 9; *see also* Compl. Ex. 11, Doc. No. 1-1 at 68.) Hoover testified that it was not her initial intent to open a "multi-office podiatric practice" with her father. (*See* Hoover Dep. 60.) Rather, as she explained, he had left Upperline and was looking into opening his own practice around the same time she was, and he was looking at office space to lease that would be outside the geographic reach of the restrictive covenants of his own agreement with Upperline. (*Id.*) Their "thought process was to . . . try to set up a way that we could both work outside our noncompetes and abide by our [covenants] that we had agreed to." (*Id.*)

Her father's relationship with Upperline also terminated in late 2023. (Hoover Dep. 57.) According to Robert Hoover, he and his partners sold their podiatry practice to Upperline in 2018, and he became a staff physician, employed by Upperline pursuant to the terms of an employment agreement ("RTH/Upperline Agreement"). (Doc. No. 40-2, R. Hoover Decl. ¶ 3.) Prior to that termination, Upperline had approached him with a new employment agreement "that (unexpectedly) called for a percentage based salary."(*Id.* ¶ 5.) He refused to take the pay cut, and Upperline then terminated the RTH/Upperline Agreement without cause on November 22, 2023, with the termination effective 60 days later. (*Id.* ¶¶ 3, 6.) The RTH/Upperline Agreement contained a restrictive covenant prohibiting Robert Hoover from competing with Upperline within ten miles

of the location where he had practiced with Upperline. (*Id.* ¶ 7.) Upperline's version of events is that Robert Hoover was not "meet[ing] the terms of his agreement," which gave Upperline the ability to terminate it and the "right to renegotiate the contract." (Doc. No. 37-3, Upperline Dep. 312, 159.) Upperline chose to terminate Robert Hoover's contract, thus also terminating his employment. (*Id.* at 312.) It offered him a new contract, which he declined. (*Id.*)

In any event, after his employment with Upperline terminated, Robert Hoover opened a clinic under the CFFAI "umbrella" in Apopka, Florida where he practiced until May 2025. (R. Hoover Decl. ¶¶ 7, 9.) This clinic was more than ten miles away from the Altamonte Springs location of his former practice. (*Id.* ¶ 7.) Meanwhile, Carli Hoover opened a clinic in Lake Mary, Florida, also under the CFFAI umbrella. (Hoover Dep. 59, 61; *see also* 1st Hoover Decl. ¶ 11.) Hoover signed the lease for the Lake Mary clinic on December 28, 2023, and the space was remodeled, at Hoover's direction, between January 2024 and mid-March 2024. (HRSUF ¶ 11.) The Apopka location, where Robert Hoover opened his practice, was located 13.55 miles away from Upperline's Orlando clinic in which Carli Hoover had worked during her employment with Upperline, but the Lake Mary clinic where Hoover actually practices is located more than fifteen miles away from the Upperline Orlando clinic. (Upperline Dep. 303.)

Hoover never practiced at the clinic in Apopka. (1st Hoover Decl. ¶ 11.) She characterized the two clinic locations as "under the same umbrella, but they were separate," meaning that they shared a National Provider Identifier ("NPI") but that the two Hoovers were "trying to create separate identities . . . underneath the umbrella of that NPI." (Hoover Dep. 61.) Her father personally signed the lease for his office space in Apopka, and he was never under any kind of contract with CFFAI; Hoover and her father each maintain her and his own professional liability

insurance. (Hoover Dep. 105, 107.) Hoover also testified that her father was never paid by CFFAI while he was working at the Apopka clinic. (*Id.* at 108.)

Upperline, however, points to social media posts by (or on behalf of) Hoover, as well as to CFFAI's website, indicating that the Lake Mary and Apopka practices were affiliated—or at least presented to the public as affiliated. (*See* Doc. No. 1-1 at 51 (Hoover Facebook announcement that she had "started the Central Florida Foot & Ankle Institute," with locations in Lake Mary and Apopka); *id.* at 55 (press release announcing that Robert Hoover had joined CFFAI's "new location in Advent Health Apopka's Medical Plaza"); *id.* at 63 (Facebook post by Hoover, reposting a post by CFFAI, and stating, "We're accepting referrals and patients at both Lake Mary & Apopka clinics."); *id.* at 64 (Facebook post by CFFAI stating, "Our podiatry team, Robert Hoover II, DPM & Carli Hoover will be speaking . . . tomorrow evening . . . ."); Doc. Nos. 37-7, 37-8, 37-9 (CFFAI web page screen shots showing "locations" in Lake Mary, Apopka, and elsewhere, including Downtown Orlando).) In addition, it is undisputed that the Lake Mary and Apopka locations shared a telephone and fax number. (HRSUF ¶ 18.)

Hoover's partner in CFFAI is Dr. Sean Griffin. Around the same time that they formed CFFAI, however, Griffin also purchased an existing practice known as Foot & Ankle Specialists of Orlando, on South Orange Avenue in Orlando, which he renamed Orlando Foot and Ankle Specialists, LLC ("OFAS"). It is undisputed that OFAS's South Orange Avenue location is less than one mile from Upperline's Downtown Orlando location where Hoover practiced. According to Griffin, this practice is in addition to, and separate from, his partnership with Hoover. (Doc. No. 40-5, Griffin Decl. ¶ 8.) He testified that this clinic "has no connection or relationship whatsoever to CFFAI," serves "different patient populations" than the CFFAI clinics, and has its own bank account. (*Id.* ¶ 9.) OFAS also "has its own EMR [Electronic Medical Records] system,

utilizes its own staff, and pays all of its own expenses." (*Id.*) Griffin also avers that Hoover has never treated patients or practiced medicine in any way at the OFAS clinic on South Orange Avenue. (*Id.* ¶ 10.)

Griffin explains that, when he formed OFAS, Hoover's husband, Troy Lippert, assisted him in doing so. (*Id.* ¶ 11.) Despite the fact that OSAS's Articles of Incorporation identify Lippert's company, TS Solutions, LLC, as a "person" "authorized to manage" the LLC, "[n]either Dr. Hoover, Troy Lippert, [n]or T2 Solutions, LLC hold[s] (or held in the past) any management or ownership interest in OFAS." (*Id.* ¶ 11.)

Likewise, Hoover was asked and testified during her deposition about why Griffin had incorporated OFAS:

Q. Why did [Griffin] have that other Orlando Foot and Ankle entity incorporated?

. . . .

A. So, he had an opportunity to fill a vacant practice, and he didn't want my restrictions stopping his potential.

Q. So, he created an entity to be separate and apart from CFFA so that he would not be aiding and abetting in any alleged violation of your restrictive covenants?

. . . .

A. Yeah.

Q. That was the intent, though, right, not to have run afoul with any Upperline deal that you had?

A. Yes.

(Hoover Dep. 69.)

Asked during her deposition whether Griffin's OFAS webpage links to CFFAI's webpage, Hoover stated that she did not believe that it did, but she had not looked. Showed a screenshot of the OFAS webpage, she agreed that a logo for CFFAI appeared there, next to a statement that said, "Dr. Griffin also sees patients in Lake Mary." (*Id.* at 148; *see also* Hoover Dep. Ex. 12, Doc. No.

37-11 at 2.) Hoover also conceded that, on the CFFAI website, if a user clicks on "locations," "Downtown Orlando" is one of the location options available. And if the user clicks on "Downtown Orlando," she is taken to the OFAS website. (Hoover Dep. 115–17; *see also* Hoover Dep. Ex. 4, Doc. No. 37-7.)

CFFAI posted a blogpost on its website on September 21, 2025, stating: "At Our Podiatry Clinic in Orlando, Dr. Sean Griffin leads our on-call podiatry services . . . . Contact us at our clinic phone line to discuss how we can support your facility's podiatry requirements." (Doc. No. 37-14.)

Hoover testified that her husband developed CFFAI's website, that she had "nothing to do with [it]," and that she did not know why Griffin's Orlando office was linked to CFFAI's website. (Hoover Dep. 116–17.) She also acknowledged that her practice was advertised on social media, including Facebook, Instagram, and LinkedIn, but she claimed that her husband manages these accounts and that she was entirely unaware of the LinkedIn page and what it showed. (Hoover Dep. 103; 123, 128.)

Hoover's husband, Kenneth Troy Lippert, signed CFFAI's Articles of Incorporation on behalf of TL Ventures Group, LLC, which is identified as the registered agent for CFFAI. (Doc. No. 1-1 at 67.)

When Hoover first opened her Lake Mary clinic, her only "staff" was Shamaria Resto. (Hoover Dep. 91.) Resto was a former Upperline employee, having worked at Upperline around the same time as Hoover. (*Id.* 149.) According to Hoover, she did not actually employ Resto. Instead, when Resto came to her seeking employment, she told Resto that she could not hire her, but Hoover's husband "gave her some work doing odd jobs for him" (*id.* at 150), and, although Resto "helped with the front desk" at Hoover's Lake Mary clinic, "like a receptionist" (*id.* at 91),

Hoover did not pay her (*id.* at 91, 150). Rather, Resto was formally employed by one of Hoover's husband's companies. (*Id.* at 91, 150; *see id.* at 150 (agreeing that, when Resto "was working for CFFA, she was being paid by [Hoover's] husband's business").)

Another former Upperline employee, Kimalo Brown, also reached out to Hoover's clinic for employment. He was not working at Upperline at the time; he was working at a hospital. Hoover employed him as a medical assistant. (*Id.* at 101–02.)

Hoover's father, Dr. Robert Hoover, was also affiliated with CFFAI from the beginning. He signed a lease for the Apopka practice in April 2024 and practiced there until May 2025, when the landlord wanted to increase the rent. (*Id.* at 104–06; *see also* Doc. No. 40-2, R. Hoover Decl. ¶ 9.) According to Hoover, she did not employ her father, and, as set forth above, her understanding was that his Apopka clinic operated independently of hers. (Hoover Dep. 59–60.) Robert Hoover similarly testified that his Apopka clinic and Hoover's Lake Mary clinic "did not commingle funds"; he did not practice at the Lake Mary clinic, and his daughter did not practice at his Apopka clinic. (R. Hoover Decl. ¶¶ 9, 11.) Currently (as of November 2025), Robert Hoover's podiatric practice is limited to providing "hospital coverage at AdventHealth Apopka, which is not affiliated with CFFAI." (*Id.* ¶ 10.)

During her employment with Upperline, Hoover had access to Upperline's patient lists, including patient contact information. (HRSUF ¶ 31.) It is undisputed that, in December 2023, prior to giving notice of her departure, Hoover ran high volume reports in Athena (the electronic medical records system that Upperline utilizes to manage patient data), using her log-in to access the system. (HRSUF ¶ 32.) According to Upperline, while running this kind of report was not prohibited, it was also not part of Hoover's job responsibilities, and she had never previously run these types of reports. (Doc. No. 37-3, Upperline Dep. 271.)

Hoover states that she accessed the Athena reports to view her productivity and collections data. (Doc. No. 50-3, 2d Hoover Decl. ¶ 2.) She also attests that Upperline had previously supplied that type of information but had stopped doing so and had begun advising its podiatrists to access that information via Athena. (*Id.* ¶ 3.) She was interested in viewing this data "due to Upperline's repeated allegations that [she was] not meeting expectations." (*Id.* ¶ 4.) When she left Upperline, she did not retain any of Upperline's property or confidential information, including patient information. (*Id.* ¶ 5; *see also* 1st Hoover Decl. ¶ 9.)

Although Hoover has treated a "handful" (fewer than a dozen) of former Upperline patients since opening her own clinic, she has not directly contacted or solicited any of her former patients. (Hoover Dep. 103–04; *see also* 1st Hoover Decl. ¶ 10.) Upperline concedes that it "cannot cause any patient to not see the provider of . . . his or her choosing." (Upperline Dep. 300.)

Upperline's corporate representative testified that Upperline suffered damages resulting from Hoover's and Robert Hoover's departures from Upperline. Specifically, she stated that Upperline has lost revenue at the Upperline Orlando Location, where Hoover formerly practiced, and at the Upperline Altamonte Springs location, where Robert Hoover formerly practiced (Upperline Dep. 295–97); did not receive the benefit of its bargain with Dr. Robert Hoover (*id.* at 302); and incurred costs in finding and securing replacements for the Upperline employees Hoover hired to work at CFFAI (including Robert Hoover) (*id.* at 153–54, 181–85).[4] Upperline also claims that it experienced impairment of, and interference, with certain of its vendor relationships—specifically, that "key contacts" had "reduced their interactions with . . . Upperline as a whole" following the Hoovers' departures. (*Id.* at 305–06; *see also id.* at 307.) Upperline could not identify

---

[4] Upperline claims that it incurred damages in replacing Hoover, but the deposition testimony it cites does not establish that fact. (*See*

anything specific that Hoover had done to cause this interruption, but it believed that "they" were "going on social media flaunting that they are with Arthrex" and had engaged in "[n]egative speaking about Upperline" and "talking bad about Upperline," because providers near Upperline's clinics where Hoover practices are no longer making referrals to Upperline. (*Id.* at 305–09.)

### B. Discussion

Upperline brings suit against Hoover for breach of several provisions of the Restrictive Covenants in her Agreement. Under Tennessee law, a claim for breach of any contract requires proving "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Tolliver v. Tellico Vill. Prop. Owners Ass'n*, 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019) (quoting *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676–77 (Tenn. Ct. App. 2007)).

In support of its Motion for Partial Summary Judgment, Upperline asserts, as a threshold matter, that its Restrictive Covenants constitute a valid and enforceable contract. It also argues that there is no genuine factual dispute as to whether Hoover materially breached the Restrictive Covenants by (1) at least indirectly competing with Upperline by establishing a multi-office podiatry practice with offices within fifteen miles of the Downtown Orlando clinic where she worked for Upperline; (2) hiring, directly or indirectly, at least three individuals who had been employed by Upperline during the preceding two years; (3) "treating former patients of Upperline in violation of the Non-Solicit"; and (4) "solicit[ing] or attempt[ing] to solicit, Upperline's industry contacts." (Doc. No. 39 at 23.) Finally, Upperline asserts that proof in the record establishes that "Hoover's breaches caused Upperline significant damage, including in the form of lost profits from certain of Upperline's clinics." (*Id.*) Specifically, it claims that Hoover "set up shop, literally, down the road from Upperline, and hired one of Upperline's most esteemed Florida podiatrists (Dr. Robert Hoover)" to staff that clinic, causing it to lose patients and the revenue associated with

those patients. (*Id.*) Upperline also claims to have experienced reputational harm, damage to vendor relationships, and the cost of hiring and training employees to replace Hoover and the former employees she hired away from Upperline, including Robert Hoover.

Hoover, in response, contends that Upperline is not entitled to summary judgment because (1) the Restrictive Covenants of the Agreement are not enforceable because they do not serve a legitimate business interest and are unreasonable, insofar as they do not comply with Tenn. Code Ann. § 63-1-148; (2) Hoover did not breach the Agreement, because she never practiced directly or indirectly at the Apopka clinic or Griffin's OFAS clinic and, therefore, did not violate the geographical restrictions of her Agreement, and she did not solicit any former Upperline patients or employees; and (3) Upperline cannot establish that any action or inaction by her caused Upperline to suffer damages. (Doc. No. 49.)

Upperline's Reply asserts that Hoover's interpretation of Tenn. Code Ann. § 63-1-148 is incorrect and that her arguments fail to establish any genuine dispute of material fact. (Doc. No. 53.)

### 1. Restrictive Covenants Generally

Generally, covenants not to compete are disfavored in Tennessee. *See Hasty v. Rent–A–Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984). Such covenants are viewed as a restraint of trade and, as such, are construed strictly in favor of the employee. *Id.* Though disfavored, restrictive covenants are contracts that will be enforced if "they are deemed reasonable under the particular circumstances." *Columbus Med. Servs., LLC v. Thomas*, 308 S.W.3d 368, 383 (Tenn. Ct. App. 2009) (quoting *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966)). Assuming that the covenants are supported by adequate consideration—a factor not at issue in this case—the threshold question in determining whether a covenant is reasonable is "whether the employer has a legitimate business interest, *i.e.*, one that is properly protectable by a non-competition covenant."

*Id.* (quoting *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999)). If so, the next question is whether the time and territorial limitations are reasonable. *Id.* Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest. *Id.* at 384 (citing *Hasty*, 671 S.W.2d at 472–73.

In sum, "[i]f the employer has such a legitimate business interest, [the court] must then determine whether the non-compete provision is reasonable and enforceable under the circumstances of this case. If the court finds that the employer does not have a legitimate protectable business interest, then the non-compete covenant is unenforceable under Tennessee law." *Id.*

### 2. Whether the Restrictive Covenants Are Enforceable

#### a) Whether Upperline Had Protectible Business Interests

For restrictive covenants to be enforceable, the employer must show that it "has a legitimate business interest, *i.e.*, one that is properly protectable by a non-competition covenant." *Vantage Tech.*, 17 S.W.3d at 644. "Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition" in order to show that it has a legitimate business interest to protect through the use of restrictive covenants. *Id.*; *see also Columbus Med. Servs.*, 308 S.W.3d at 384 ("There is no legitimate interest in protection from competition, only from unfair competition."). "Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with

the customers on behalf of the employer." *Columbus Med. Servs.*, 308 S.W.3d at 384 (quoting *Vantage Tech.*, 17 S.W.3d at 644). "These considerations may operate individually or in tandem to give rise to a properly protectable business interest." *Id.*

Upperline here argues that it has a protectable business interest in the relationship between its employees and its customers and that Hoover "interacted frequently and repeatedly with Upperline's patients for around two years," thus creating "intimate patient-employee relationships" that "Tennessee law allows Upperline to protect." (Doc. No. 39 at 13.) It asserts that Hoover, during her employment, became "the face" of Upperline in the "Orlando, Florida community." It also argues that it provided Hoover with specialized training on "how Upperline distinguishes itself from its competitors and sets itself apart in the podiatric field." (*Id.*) For example, Upperline says, Hoover "learned and reaped the benefit of Upperline's innovative, specialized line of podiatric clinics and the several tools, processes, and initiatives that Upperline has developed that are unique to that line of clinics." (*Id.* (citing Upperline SUF ¶¶ 6, 31, 41.) The Statements of Fact to which Upperline refers pertain to (1) the execution of the Agreement (SUF ¶ 6); (2) Hoover's access to Upperline's patient lists and patient contact information (SUF ¶ 31); and (3) the specialized training it contends that Hoover received (SUF ¶ 41).

Hoover does not dispute, as a legal matter, that an employer may have a legitimate interest in protecting customer relationships and its investment in specialized training. She contends, however, that there are genuine issues of material fact as to (1) whether she had the type of "repeated contacts with any patients so as to be 'the face' of Upperline to those patients" and (2) whether Upperline provided her any "specialized training." (Doc. No. 49 at 13.)

Regarding whether Hoover became the "face" of Upperline in the community she served, Upperline's representative testified very generally that Upperline's relationships with its patients

are created "through the clinical team in the clinic," including the staff and the podiatrists. (Upperline Dep. 300–01.) In particular, the podiatrists are "the ones seeing the patients, and obviously, relationship and trust [are] built at that level and not with the entity." (*Id.*)

Hoover, on the other hand, points out that, she was employed from late August 2022 through late February 2024 but took a seven-week maternity leave beginning in December 2022, so she practiced podiatry for Upperline for a total of approximately sixteen months. (*Id.* 26, 29, 30; *see also* Upperline Dep. 271–18.) In addition, Upperline's representative testified about Upperline's calculations regarding the number of return visits its podiatrists have in a given year. As the court understands the testimony that Hoover highlights, Upperline keeps track of the average return rate of patients—specifically, how many of each doctor's patients were coming back at least 2.5 times per year. (Upperline Dep. 239 (referring to a comparison chart that "takes all of [the] patients" of the physicians being compared and "shows how many were seen 2.5 times over the year and . . . their average return of patients").) Hoover's "return rate of her patients was 30.6." (*Id.* at 240–41.) It is unclear from context whether Upperline's testimony means that 30.6 percent of Hoover's patients returned 2.5 times in a given year, or whether an average of 30.6 patients per 1000 returned 2.5 times per year. But, in either event, Hoover's rate was significantly lower than that of the other physicians Upperline referenced. (*Id.* at 240.)

Tennessee law is clear that "[a]n employer may . . . have a legitimate protectable interest in the relationships between its employees and its customers." *Vantage Tech.*, 17 S.W.3d at 645. Courts recognize that, when a "customer associates the employer's business with the employee due to the employee's repeated contacts with the customer[,] that employee in essence becomes 'the face' of the employer." *Am. Home Shield Corp. v. Ozur*, No. 16-CV-2400-SHL-TMP, 2016 WL 8738243, at *4 (W.D. Tenn. Sept. 13, 2016) (internal quotation marks removed) (quoting

*Vantage Tech.*, 17 S.W.3d at 645). Here, Upperline has presented very general testimony about how its podiatrists are generally the "face" of its business, but it has not presented any specific information to establish that Carli Hoover actually became the face of its business in the sixteen months that she spent as an Upperline employee. It has not shown that it marketed her as specifically associated with Upperline, and it has not offered concrete evidence regarding how many patients during her sixteen-month tenure Hoover actually saw more than once in the less than eighteen months that she practiced for Upperline. Nor is there any evidence in the record establishing that a significant number of her Upperline patients actually followed her to her Lake Mary clinic, more than fifteen miles away. According to Hoover, she never directly solicited any of her former patients and has actually seen no more than a handful of them since leaving Upperline. And she denies that she ever had the type of "repeated contacts with the customer" to become "the face" of Upperline to her patients. *See Vantage Tech.*, 17 S.W.3d at 645.

The law is also clear that an "employer may have a protectable interest in the *unique* knowledge and skill that an employee receives through special training." *Vantage Tech.*, 17 S.W.3d at 645 (emphasis in original). General knowledge and skill, however, do not amount to a protectable interest. *Id.* Rather, "[a] line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business." *Id.*

Upperline has provided some vague evidence in support of its assertion that Hoover benefited from specialized training. (*See, e.g.*, Upperline Dep. *id.* at 91 (in which Upperline's representative testified that she "can't speak directly" to whether Hoover "did or did not" attend offsite training, but noting that Upperline "offer[s] a lot of training courses and quarterly meetings where education and training is provided to providers" and that Hoover attended those quarterly meetings in 2023); *id.* at 173 ("[A]ny physician who joins Upperline from . . . residency . . . get[s]

more training, they obviously get a longer training period, and they get more coaching from senior DPMs.").) According to Hoover, on the other hand, she was a fully licensed podiatrist who had completed a surgical residency before she began working for Upperline. (1st Hoover Decl. ¶ 5.) She claims the only "training" she received from Upperline was during the "onboarding" process that took place over three or four days in late August 2022, which simply offered a "general overview of being employed by Upperline and a welcome to the company." (*Id.* ¶ 7.) While most of the onboarding process was "spent on social events," Hoover also received a password to access Upperline's systems, a computer, and a "general overview" of Upperline's Electronic Medical Records ("EMR") system. (*Id.*; *see also* Hoover Dep. 20–21.) She states that she did not receive any additional training, "much less any type of specialized training." (1st Hoover Decl. ¶ 8.)

Based on the conflicting testimony, the court finds that material issues of fact preclude summary judgment on the threshold question of whether Upperline had legitimate, protectible business interests that justify the Restrictive Covenants. On this basis alone, summary judgment for Upperline on its breach of contract claims is not warranted. The court nonetheless finds it useful to consider the parties' arguments regarding the proper interpretation of Tenn. Code Ann. § 63-1-148 and the other elements of Upperline's breach of contract claims.

> b) *Whether the Restrictive Covenants Are Per Se Unreasonable Under Tenn. Code Ann. § 63-1-148*

Hoover argues that § 63-1-148 renders the geographic restrictions in her Restrictive Covenants unreasonable *per se*. Upperline argues that Hoover's interpretation of the statute is incorrect.

In 2005, the Tennessee Supreme Court held that, "except for restrictions specifically provided for by statute, covenants not to compete are unenforceable against physicians." *Murfreesboro Medical Clinic, P.A. v. Udom*, 166 S.W.3d 674, 684 (Tenn. 2005). The statute at

issue was Tenn. Code Ann. § 63-6-204, which, at the time, specifically authorized physician covenants not to compete in "two limited circumstances": "(1) when the employer is a hospital or an affiliate of a hospital, and (2) when the employer is a 'faculty practice plan' associated with a medical school." *Id.* at 681 (footnote omitted) (citing Tenn. Code Ann. § 63-6-204(d)(2), (e)(1), (2)).

In response to that ruling, the Tennessee legislature amended the Tennessee Code to broaden the circumstances in which such covenants are permissible by enacting a new provision designated as Tenn. Code Ann. § 63-1-148 that went into effect on January 1, 2008. The post-*Murfreesboro Medical Clinic* statute provided, and still provides:[5]

> (a) A restriction on the right of an employed or contracted healthcare provider to practice the healthcare provider's profession upon termination or conclusion of the employment or contractual relationship *shall be deemed reasonable* if:
>
> > (1) The restriction is set forth in an employment agreement or other written document signed by the healthcare provider and the employing or contracting entity; and
> >
> > (2) The duration of the restriction is two (2) years or less and either:
> >
> > > (A) The maximum allowable geographic restriction is the greater of:
> > >
> > > > (i) A *ten-mile radius* from the primary practice site of the healthcare provider while employed or contracted; or
> > > >
> > > > (ii) The county in which the primary practice of the healthcare provider while employed or contracted is located; or
> > >
> > > (B) There is no geographic restriction, but the healthcare provider is restricted from practicing the healthcare provider's profession at any facility at which the employing or contracting entity provided services while the healthcare provider was employed or contracted with the employing or contracting entity.

---

[5] The layout of the statute has been reconfigured since its initial passage, but the current language is virtually identical to the original.

Tenn. Code Ann. 63-1-148(a) (2012) (emphasis added).[6]

Upperline asserts in an entirely conclusory fashion that the Restrictive Covenants "do not violate" § 63-1-148. (Doc. No. 38 at 16.) In a footnote, it construes the statute as setting forth a baseline for what restrictions "shall" be deemed "reasonable" while not expressly stating that greater restrictions are *per se* unreasonable. (*Id.* at 16 n.6.) Upperline argues that the court must independently determine whether the fifteen-mile restriction in Hoover's Agreement is reasonable and, if it is not, "engage in a 'blue-penciling' exercise" as permitted by the Agreement. (*Id.*)

Hoover responds by arguing that restrictive covenants in physician contracts in Tennessee are enforceable *only* if they fall within the limits established by § 63-1-148(a). She asserts that "every court applying Section 148" has held that the provision "does precisely what it says it does, which is to permit non-compete agreements between physicians in *limited circumstances*." (Doc. No. 49 at 10 (citing S*kaf v. Wyo. Cardiopulmonary Servs., P.C.*, 495 P.3d 887, 896 (Wy. 2021); *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 728 (Ind. 2008)).) She also asserts that these "persuasive" out-of-state opinions are "consistent" with the Tennessee Court of Appeals' statement that "Section 148 imposes restrictions—as opposed to a baseline—on restrictive covenants limiting a healthcare provider's practice." (*Id.* (citing *Edwards v. Urosite Partners*, No. M2016-01161-COA-R3-CV, 2017 WL 1192109 (Tenn. Ct. App. Mar. 30, 2017)).) Upperline replies that Hoover's interpretation contradicts the plain language of the statute and was "rejected" by the undersigned when it entered a Temporary Restraining Order in *Vestile v. Upperline Healthcare, PC*, No. 3:23-cv-00385 (M.D. Tenn. May 19, 2023), ECF No. 20.

Both parties are wrong to suggest that *any* court, state or federal, has directly addressed the question presented here, which is whether the statute imposes an upper limit on what restrictions

---

[6] Other parts of § 63-1-148 are not applicable in this case.

will be deemed reasonable or, instead, simply a baseline as to what restrictions will presumptively be considered reasonable. This court's research has not yielded any case in which any court directly considered that issue. In *Vestile*, the physician defendant had an agreement with restrictions similar to Hoover's, but he had set up practice two miles away from the clinic where he had practiced for Upperline, after his employment with Upperline terminated, so the court had no need to consider whether the fifteen-mile geographic limitation in his restrictive covenant was reasonable. In the three cases cited by the defendant, the courts simply referred in passing to § 63-1-148 as "imposing restrictions" on physician non-competition agreements, *see Edwards*, 2017 WL 1192109, at *9, but they were not called upon to construe the statute. *See Cent. Ind. Podiatry*, 882 N.E.2d at 728 (rejecting the defendant's argument that physician covenants not to compete should be declared void as against public policy, and noting that the Tennessee legislature, in the wake of *Murfreesboro Medical Clinic*, had enacted § 63-1-148 to "permit[] physician noncompetition agreements if they are in writing, last two years or less, and keep within certain geographical limitations"); *Skaf*, 495 P.3d at 896 (similarly noting that *Murfreesboro Medical Clinic* had been "superseded by statute," and characterizing § 63-1-148 as "permitting non-compete agreements between physicians in limited circumstances"). To this court's knowledge, no Tennessee court has construed § 63-1-148(a).

"When there is no state law construing a state statute, a federal court must predict how the state's highest court would interpret the statute." *United States v. Simpson*, 520 F.3d 531, 536 (6th Cir. 2008) (citing *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999)); *see also Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019) ("Here, it is not disputed that the Ohio Supreme Court has not yet passed on § 4123.88, and thus we must predict how that

court would interpret the statute."). The Tennessee Supreme Court has explained how it undertakes to construe a statute:

> This Court's role in statutory interpretation is to determine what a statute means. Specifically, we must decide how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued. Original public meaning is discerned through consideration of the statutory text in light of well-established canons of statutory construction.
>
> We give the words of a statute their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose. In the absence of statutory definitions, we look to authoritative dictionaries published around the time of a statute's enactment.
>
> We consider the whole text of a statute and interpret each word so that no part will be inoperative, superfluous, void or insignificant. We also consider the overall statutory framework. Statutes "*in pari materia*"—those relating to the same subject or having a common purpose—are to be construed together.

*State v. Deberry*, 651 S.W.3d 918, 924–25 (Tenn. 2022) (alterations, quotation marks, and citations omitted).

In light of this guidance, this court notes, first, that § 63-1-148(a) must be read in conjunction with § 63-6-204, which limits the corporate practice of medicine and addresses covenants not to compete in the context of contracts between hospitals and practitioners. One of the restrictions on covenants not to compete in that statute contains language expressly providing that covenants pertaining to physicians from whom a hospital employer ("employing entity") purchased a practice are prohibited *unless* their limitations fall within certain parameters. *See* Tenn. Code Ann. § 63-6-204(f)(2)(A). That language strongly suggests that, when the Tennessee legislature wants to entirely prohibit restrictions broader than those set forth in a statutory provision, it knows how to do so. Other provisions in the statute simply cross-reference § 63-1-148. *See, e.g., id.* § 63-6-204(f)(2)(B) ("For physicians employed independently of a bona fide practice purchase, employing entities shall not restrict the employed physician's right to practice medicine upon the termination or conclusion of the employment relationship, *except as allowed*

*by § 63-1-148 or any successor section.*" (emphasis added)). And another, pertaining to physicians employed by faculty practice plans, states that such practice plans

> may impose restrictions or prohibitions upon an employed physician's right to practice medicine upon the termination or conclusion of the employment relationship provided that:
>
> (A) The maximum area of the restrictions or prohibitions is the greater of:
>
> (i) The county in which the primary practice site is located; or
>
> (ii) A ten (10) mile radius from the primary practice site; and
>
> (B) The maximum duration of the restrictions or prohibitions is two (2) years.

*Id.* § 63-6-204(h)(2). But this subsection also specifically states that "[t]he requirements of this subsection (h) shall not be construed to preclude the enforceability of any restrictive covenant or prohibition exceeding the requirements or conditions of this subsection (h) that is reasonable and not inimical to the public interest under the common law principles governing restrictive covenants." *Id.* § 63-6-204(h)(6).

Section 63-1-148 does not contain language expressly prohibiting restrictive covenants that do not comply with its terms, as does § 63-2-204(f)(2)(A). Nor does it expressly recognize that restrictions broader than those approved by the statute may be permissible if otherwise reasonable under common law, as does § 63-6-204(h)(6). However, construing the plain language of § 63-1-148 in light of § 63-2-204, the court finds that it means what it says: restrictions in a written, signed agreement are reasonable if their duration is not more than two years and the maximum geographical restriction is ten miles or county-wide, whichever is greater. The court understands the geographical restriction to mean that a ten-mile restriction is presumptively reasonable even if it extends into another county, and a county-wide restriction is reasonable even if it extends more than ten miles.

But the court agrees with Upperline that this language cannot be read to mean that a twelve- or fifteen- or twenty-mile geographic restriction is *per se* unreasonable. To find otherwise would lead to illogical results. For example, in this case, the court takes judicial notice that Apopka is in Orange County, Florida, as is Orlando. If Upperline had written Hoover's Agreement to prohibit her from working within Orange County for two years after her employment with Upperline terminated, then that restriction would be deemed reasonable under the statute, and opening a practice in Apopka would clearly have been prohibited. The court cannot logically find that, just because the Agreement used a fifteen-mile radius rather than a county-wide restriction, it is unreasonable.

In short, § 63-1-148 does not impose an upper limit on reasonability of geographic restrictions in physician covenants not to compete, and the geographic restriction in Hoover's Agreement is reasonable under the circumstances presented here.[7]

---

[7] Hoover's argument that the Restrictive Covenants are unreasonable, insofar as they restrict her from providing podiatry services "anywhere within the State of Florida," is irrelevant. First, the clause to which she refers limits her ability to work for a "podiatry or medical management services organization" or to provide "business, management, administrative, marketing or support services" for a podiatric or medical practice, neither of which she is alleged to have done. Second, Upperline does not seek to enforce this provision.

Similarly, Hoover's assertion that Upperline's acceleration of her notice period constitutes a termination that voids the Restrictive Covenants is also patently without merit. The Agreement gave Upperline the right to accelerate "the effective date of termination" once Hoover gave notice of resignation. (Agreement ¶ 6(b).) Upperline also had the right to terminate without cause upon providing thirty days' written notice. (*Id.* ¶ 6(d).) In either event, the Restrictive Covenants were effective for two years "after termination of this Agreement, by any means and regardless of the reason therefor." (*Id.* ¶ 12(a).) Thus, termination by Upperline, even without cause, would not void the Restrictive Covenants.

### 3. Breach

Assuming Upperline can establish the existence of protectible business interests and, therefore, an enforceable covenant not to compete, the second element of Upperline's breach of contract claim is Hoover's nonperformance of her obligations under the contract.

For purposes of this element, it is, at a minimum, undisputed that Hoover employed Kimalo Brown, who had previously been employed by Upperline within the preceding two years. The fact that Brown had already left Upperline and was employed by a different entity before he began working for Hoover, as Hoover argues, is beside the point, given how the Agreement is worded. (*See* Agreement ¶ 12(a)(ii) (barring Hoover from "hir[ing], employ[ing] or engag[ing] any person who is or, at any time during the immediately preceding twenty-four (24) month period, was an employee or independent contractor of Employer").) In addition, while Hoover denies that she technically employed Shamaria Resto, asserting that Resto was paid by one of Hoover's husband's companies, it is undisputed on the record that Hoover engaged Resto to perform services at Hoover's practice and that Resto had been employed by Upperline just prior to being engaged by Hoover. Irrespective of what entity paid Resto's wages, Hoover breached her Restrictive Covenants by hiring and/or engaging both Brown and Resto.

Hoover's relationship with her father is less straightforward. Although they both practiced under the CFFAI "umbrella," the structure of their professional relationship is unclear from the record. The evidence before the court indicates that Robert Hoover signed his own lease, performed his own billing, and was not paid, employed, or "engaged" by Hoover or CFFAI, directly or indirectly. The court finds that there is a material factual dispute as to whether their relationship constituted a violation of Paragraph 12(a) of Hoover's Agreement.

Upperline also maintains that Hoover violated the Restrictive Covenants by directly or indirectly competing with it, as that term is defined by the Agreement. As set forth above, the

Agreement states that Hoover, as the "Podiatrist," "shall not, *either directly or indirectly*, by . . . herself or by, for or *in conjunction with any other person, company, enterprise or entity* . . . [c]ompete with Employer." (Agreement ¶ 12(a) (emphasis added).) "Compete" is defined to mean, as relevant here:

> to engage or participate or *be involved in any capacity* in . . . the practice of podiatric medicine . . . or *the provision, performance or offer* of any type of podiatry or medical treatment, procedures, goods or services, ancillary or related goods or services or otherwise compet[e] with Employer . . . anywhere within a fifteen (15) mile radius from the location at which Podiatrist provides services on behalf of Employer . . . .

(*Id.* ¶ 12(a)(i) (emphasis added).)

Without addressing the language of the Restrictive Covenants, the social media posts announcing Robert Hoover's practice in affiliation with CFFAI, or CFFAI's website linking to the Apopka location and Sean Griffin's OFAS clinic, Hoover asserts that there are material factual disputes as to whether she breached the non-compete clause of the Agreement, noting specifically that, since leaving Upperline, she personally has not seen patients or practiced medicine at any clinic other than her Lake Mary clinic, which is outside the geographic restrictions contained in the Restrictive Covenants; she did not "solicit, recruit, induce, or endeavor to entice away" any former Upperline employees, including Robert Hoover; and she has not solicited former patients. (Doc. No. 49 at 17.) She also asserts that there has been no commingling of funds between her Lake Mary clinic and Robert Hoover's former Apopka clinic and that Sean Griffin's OFAS clinic is entirely separate from CFFAI. (*Id.*) Regardless, it seems clear from the record that Hoover, through her ownership interest in CFFAI, was involved in offering, at least indirectly, podiatric services at her father's clinic in Apopka and at Griffin's OFAS clinic, simply by associating those practices with her own on CFFAI's website. In other words, these actions put her in breach of her Restrictive Covenants.

### 4. Damages

The third element of a breach of contract claim is damages resulting from the defendant's nonperformance. To recover damages in a breach of contract action, a plaintiff must prove both the *existence* and the *amount* of damages. *Tennison Bros., Inc. v. Thomas*, 556 S.W.3d 697, 724 (Tenn. Ct. App. 2017). At this juncture, Upperline seeks partial summary judgment only on the existence of damages resulting from Hoover's breach, leaving the quantification of damages for trial.

"In general, the *existence* of damages cannot be uncertain, speculative, or remote . . . ." *Id.* (citations omitted).[8] The "reasonable certainty" standard for proving the existence of damages is a "flexible standard allowing courts to take the particular facts of each case into consideration." *Id.* at 725 (citing *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004)). "The existence of damages has been proven with reasonable certainty when the mind of a prudently impartial person is satisfied that the injured party has been damaged." *Id.* (quoting *Waggoner Motors*, 159 S.W.3d at 5).

Aside from the existence of damages, "[c]ausation is an essential element" of a breach of contract claim. *K&M Knights Express, Inc. v. Hullett's Serv. Ctr., LLC*, No. 23-5932, 2025 WL 619173, at *2 (6th Cir. Feb. 26, 2025) (citing *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). And Tennessee courts, in fact, have long recognized that proof of damages "is an inherent weakness in noncompetition cases," as a result of which injunctive relief is often the "only available remedy." *Interstate S. Packaging, LLC v. Korman*, No. 2:20-CV-207, 2021 WL 5161910, at *14 (E.D. Tenn. Sept. 5, 2021) (quoting *Gibbons v. Bennett*, No. E2019-

---

[8] The amount, however, "may be uncertain if the plaintiff lays a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages." *Tennison Bros.*, 556 S.W.3d at 724.

02188-COA-R3-CV, 2021 WL 423806, at *15 (Tenn. Ct. App. Feb. 8, 2021) (quoting the trial court's opinion, which quoted *Bradford & Carson v. Montgomery Furniture Co.*, 92 S.W. 1104, 1110 (Tenn. 1906), as noting that "[t]he chief difficulty found in actions for breaches of contracts of this character, is in ascertaining the damages which the plaintiff can recover, as they are generally uncertain, remote, and speculative.")).

Upperline indicates that it no longer seeks injunctive relief or specific performance since, as it says, the "toothpaste is already out of the tube." (Doc. No. 38 at 21 n.8.) Instead, it seeks damages in light of Hoover's "blatant material breaches of the Agreement." (*Id.*) But, as noted, proving damages resulting from a breach in situations like this one is difficult, and the court finds, at this juncture, that there are material factual disputes that preclude summary judgment on the issue of the existence of damages.

Specifically, as the defendant argues, Robert Hoover's employment agreement terminated around the same time as Hoover's did, and he declined Upperline's offer to enter into a different contract with less favorable terms. In other words, the evidence in the record indicates that he was leaving Upperline irrespective of what his daughter did. Moreover, opening a practice in Apopka was *within the parameters* of the restrictive covenants in Robert Hoover's agreement. Accordingly, it is difficult to see how whatever damages Upperline may have incurred from the termination of Robert Hoover's practice and his decision to open a new clinic more than ten miles away from the clinic where he had practiced for Upperline can be attributed to Carli Hoover's breach of her Agreement. Similarly, Carli Hoover can hardly be charged with Upperline's costs in replacing Robert Hoover when it was going to incur those costs regardless of what Carli Hoover did.

Likewise, although Hoover was barred by her Agreement from hiring former Upperline employees, and Upperline seeks as damages the costs incurred in hiring new employees to replace the two who went to work for her, at least one of those employees (Brown) had already left and, presumably, had been replaced, even before he went to work for Hoover. As for Resto, there is no evidence that Hoover actively recruited her or sought to employ her, and no evidence regarding whether Resto intended to leave (or had already left) her employment with Upperline, regardless of whether Hoover would employ her.

In short, material factual disputes preclude summary judgment as to the existence of damages to Upperline flowing from from Carli Hoover's breach of the Restrictive Covenants.

### C. Conclusion: Upperline's Motion for Partial Summary Judgment

Material factual disputes preclude summary judgment, even partial summary judgment, in favor of Upperline. First, material factual disputes preclude summary judgment on the question of whether Upperline had protectible interests in this case that justify enforcement of the Restrictive Covenants at all. Assuming that Upperline can prove the existence of an enforceable agreement, while it is clear that Hoover breached her Restrictive Covenants, there are also material factual disputes as to whether Upperline actually suffered damages resulting from these breaches. Upperline's motion, therefore, will be denied.

## IV. HOOVER'S MOTION FOR SUMMARY JUDGMENT

Hoover moves for summary judgment, raising essentially the same arguments and pointing to essentially the same facts discussed above in connection with Upperline's Motion for Partial Summary Judgment. And, for largely the same reasons that Upperline is not entitled to summary judgment, Hoover is not entitled to summary judgment either.

First, the court rejects, as set forth above, Hoover's argument that the geographic scope of her Restrictive Covenants is unreasonable as outside the range permitted by Tenn. Code Ann. § 63-1-148(a).

Second, while the evidence establishes that Hoover never personally practiced podiatry at Robert Hoover's Apopka clinic or at Sean Griffin's Downtown Orlando OFAS clinic, the evidence also establishes that, through her ownership interest in CFFAI, she at least indirectly offered and was involved in the offering of podiatric services at both of those clinics, in violation of the non-competition provision of the Restrictive Covenants in her Agreement.

Third, while the court agrees with Hoover's argument that there is no evidence that she solicited any former Upperline patients, her assertion that she never "solicited" any former Upperline *employees* is beside the point, since the Agreement prohibited her from hiring anyone who had been employed by Upperline during the preceding two years. As set forth above, the undisputed evidence establishes that Hoover breached that prohibition.

Hoover is not entitled to summary judgment.

## V.      CONCLUSION

For the reasons set forth herein, both parties' summary judgment motions (Doc. Nos. 37, 40) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge